FILED
Jul 28 2021
2:56 pm
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY s/ emilybl DEPUTY

SEALED

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

December 2020 Grand Jury

UNITED STATES OF AMERICA,

Plaintiff,

v.

[redacted] (1),
[redacted] (2),
TIMOTHY INGRAM (3),
aka "Bleezy",
ANAJAH GIFFORD (4),
[redacted] (5),
[redacted] (6),
JACK OWUOR (7),
[redacted] (8)

Defendants.

Case No. '21 CR2216 CAB

INDICTMENT

Title 18, U.S.C., Sec. 1962(d) – Conspiracy to Conduct or Participate in an Enterprise Through a Pattern of Racketeering Activity; Title 18, U.S.C., Sec. 1963 – Criminal Forfeiture

The grand jury charges:

At all times material to this Indictment:

Count 1
(Conspiracy to Conduct or Participate in an Enterprise Through a Pattern of Racketeering Activity)

THE ENTERPRISE

1. Defendants [redacted] TIMOTHY INGRAM, aka "Bleezy," ANAJAH GIFFORD, [redacted] JACK OWUOR, and [redacted] and others known and unknown to the grand jury, were members and associates of a criminal organization referred to hereinafter as "THE ENTERPRISE." In furtherance of a nationwide "grandparent scam" that targeted elderly Americans, members and associates of THE ENTERPRISE engaged in extortion,

fraud, and money laundering. At all relevant times, THE ENTERPRISE operated throughout the United States, including in the Southern District of California.

2. THE ENTERPRISE, including its leaders, members, and associates, constituted an "enterprise," as defined in Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact, although not a legal entity. The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise. The enterprise engaged in, and its activities affected, interstate and foreign commerce.

3. Members and associates of THE ENTERPRISE played different roles in the enterprise at different times:

a. At various times relevant to this Indictment, members and associates acted as mules for THE ENTERPRISE. Mules, or couriers, received and transferred money obtained from victims. Mules generally received or transferred victim-sourced funds through in-person cash pick-ups, mailed cash payments, peer-to-peer transfers, and wire transfers into bank accounts associated with the mules. After receiving funds, mules transferred the criminal proceeds to other members or associates of the enterprise. At times, mules recruited others to serve as mules for THE ENTERPRISE.

b. At various times relevant to this Indictment, members and associates acted as crew leaders for THE ENTERPRISE. Crew leaders recruited, organized, and directed groups of mules. Crew leaders collected, transferred, and tracked victim money as it moved from mules to others within THE ENTERPRISE. Crew leaders generally received information regarding victim identification and contact from nationwide organizers, which crew leaders then provided to mules for money pick-ups.

c. At various times relevant to this Indictment, members and associates acted as nationwide organizers for THE ENTERPRISE. Nationwide organizers provided information to crew leaders regarding, among other things, identification and location of victims, timing and amounts of cash pickups, and incoming wire transfers.

//

MEMBERS AND ASSOCIATES OF THE ENTERPRISE

4. The following defendants were members and associates of THE ENTERPRISE:

a. [redacted]

b. [redacted]

c. TIMOTHY INGRAM, aka Bleezy, ("INGRAM"), a resident of California;

d. ANAJAH GIFFORD ("GIFFORD"), a resident of California;

e. [redacted]

f. [redacted]

g. JACK OWUOR ("OWUOR"), a resident of California; and

h. [redacted]

5. The following persons, each of whose identity is known to the Grand Jury, were mules for THE ENTERPRISE:

a. "Mule-1," a resident of California;

b. "Mule-2," a resident of California;

c. "Mule-3," a resident of California;

d. "Mule-4," a resident of Florida;

e. "Mule-5," a resident of California;

f. "Mule-6," a resident of Florida;

g. "Mule-7," a resident of Florida;

h. "Mule-8," a resident of California;

i. "Mule-9," a resident of California;

j. "Mule-10," a resident of California;

k. "Mule-11," a resident of California; and

l. "Mule-12," a resident of Florida.

PURPOSES OF THE ENTERPRISE

6. The purposes of the enterprise included the following, among others:

a. To enrich the members and associates of the enterprise through, among other things, fraud and extortion;

b. To obtain, preserve, and protect the proceeds of the enterprise through acts of money laundering; and

c. To protect the enterprise and its members and associates from detection, apprehension, and prosecution by law enforcement.

## MANNER AND MEANS OF THE ENTERPRISE

7. The means and methods by which members and associates of the enterprise agreed to conduct and participate in the conduct of the affairs of the enterprise included, but were not limited to, the following:

a. Members and associates contacted elderly victims, usually by telephone, and impersonated a grandchild, other close relative, or friend of the victim. Members and associates falsely convinced the victims their relatives were in legal trouble and needed money to pay for bail, pay medical expenses for car accident victims, or prevent additional charges from being filed.

b. To convince the victims of their legitimacy, members and associates impersonated attorneys and employees of security and courier services. Members and associates also provided victims with false file or case numbers, and used nicknames known to the victims.

c. To increase the likelihood of successfully obtaining money from the victims, members and associates instructed the victims to lie to family, friends, and representatives of financial institutions. Specifically, at times during the conspiracy:

i. Members and associates instructed victims not to tell family members.

ii. Members and associates told victims that a judge had entered a gag order in their relative's court case, prohibiting the victim from discussing the existence of the case with anyone, including family or friends. Victims were further instructed that, if they violated the gag order, they or their relative would face increased penalties, including criminal charges and imprisonment.

iii. Members and associates instructed victims to provide false information to financial institutions when withdrawing or transferring money, including providing false reasons for the withdrawal or transfer.

d. Through such extortion and fraud, members and associates induced elderly victims to each provide thousands to tens of thousands of dollars to purportedly help their grandchild, close relative, or friend. Members and associates obtained money from victims generally through in-person cash pick-ups, use of the mail and commercial carriers, cashier's checks, and wire transfers.

e. Members and associates took steps to conceal their true identities from victims and law enforcement, including using false names, renting residences for the purpose of receiving cash sent through the mail and commercial carriers, and using rental cars or ride share vehicles to pick up funds from victims.

f. Members and associates transferred funds obtained from victims among members and associates of THE ENTERPRISE using various means. Specifically:

i. Members and associates arranged for the in-person transfer of cash from mules to crew leaders and others.

ii. In the case of wire transfers sent by victims, members and associates quickly withdrew or transferred the funds from the receiving account.

iii. To ensure that each member of the enterprise obtained his or her "cut" of the proceeds, members and associates transferred money in cash, wire transfers, and through various peer-to-peer mobile applications, including through the accounts of associates.

iv. Members and associates converted victim proceeds from fiat currency to cryptocurrency.

g. Members and associates traveled throughout the United States to pick up cash in person from victims, collect cash mailed by victims, and transfer money to other members of the enterprise.

h. Members and associates recruited additional individuals to serve as mules through various means, including social media platforms.

i. Members and associates used various means to communicate with each other regarding victims and the transfer of money, including text messages and encrypted messaging applications.

THE RACKETEERING CONSPIRACY

8. Beginning on or before November 1, 2019, the exact date being unknown to the grand jury, and continuing until on or about October 14, 2020, within the Southern District of California and elsewhere, defendants [redacted] TIMOTHY INGRAM, aka "Bleezy," ANAJAH GIFFORD, [redacted] JACK OWUOR, and [redacted] and others known and unknown to the grand jury, being persons employed by and associated with THE ENTERPRISE, which enterprise was engaged in, and the activities of which affected, interstate and foreign commerce, did knowingly, willfully, and unlawfully combine, conspire, confederate, and agree with each other, and with others, to violate Title 18, United States Code, Section 1962(c), that is, to conduct and participate, directly and indirectly, in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as that term is defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisting of:

a. Multiple acts involving extortion, which is chargeable under California Penal Code, Sections 182(a)(1), 518(a), and 524;

b. Multiple acts indictable under:

i. Title 18, United States Code, Section 1341 (relating to mail fraud);

ii. Title 18, United States Code, Section 1343 (relating to wire fraud);

iii. Title 18, United States Code, Section 1344 (relating to financial institution fraud);

iv. Title 18, United States Code, Section 1956 (relating to the laundering of monetary instruments); and

v. Title 18, United States Code, Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity).

9. It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the enterprise.

OVERT ACTS

10. In furtherance of the conspiracy and to achieve the object thereof, defendants, and others known and unknown, committed and caused to be committed overt acts, among others, within the Southern District of California and elsewhere, including, but not limited to, the following:

Victim N.G.

10.1. On or about November 1, 2019, an unknown male contacted N.G., an 82-year-old woman residing in Richardson, Texas, claiming to be her grandson. The "grandson" stated that he was in jail in California and needed N.G. to send money to help him get out.

10.2. On or about November 1, 2019, a second unknown male contacted N.G., claiming to be the attorney for her "grandson," and provided N.G. with wire instructions for the payment. That same day, N.G. went to her bank and sent a wire transfer to the account provided to her by the "attorney."

10.3. On or about November 1, 2019, Mule-1 received a wire transfer from N.G. in the amount of $20,000.

10.4. On or about November 2, 2019, INGRAM directed Mule-2 to instruct Mule-1 to withdraw N.G.'s money from her bank account using multiple transactions, bank locations, and withdrawal amounts of $8,500 or less.

10.5. On or about November 5, 2019, Mule-1 received a second wire transfer from N.G. in the amount of $30,000.

10.6. Beginning on or about November 5, 2019, and continuing until on or about November 14, 2019, INGRAM and Mule-2 exchanged messages relating to Mule-1's

disposition of the funds received from N.G. INGRAM also instructed Mule-2 to delete the messages between INGRAM and Mule-2.

Victim G.W.

10.7. On or about November 21, 2019, INGRAM exchanged a series of messages with Mule-3, recruiting Mule-3 to receive a wire transfer into Mule-3's bank account.

10.8. On or about December 17, 2019, an unknown male claiming to be an assistant to an attorney in Florida contacted G.W., a 75-year-old man residing in Paso Robles, California. The unknown male claimed that the son of G.W.'s friend was in jail in Florida.

10.9. On or about December 17, 2019, a second unknown male pretending to be the son of G.W.'s friend told G.W. by phone that he had been arrested after police pulled him over for speeding and found a weapon in his car. The unknown male asked G.W. to pay $12,500 for his bail. On or about December 17, 2019, at the instruction of the two unknown males, G.W. told bank employees that he was helping a friend with funeral expenses, and sent a $12,580 wire transfer to Mule-3's bank account.

10.10. On or about December 17, 2019, Mule-3 received the $12,580 wire transfer from G.W., then made two cash withdrawals in the amounts of $8,500 and $4,000.

10.11. On or about December 17, 2019, INGRAM met with Mule-3 in person to collect the funds received from G.W.

10.12. On or about December 17, 2019, [redacted] directed INGRAM to deposit $11,322 to a bank account associated with Mule-4.

10.13. On or about December 17, 2019, INGRAM messaged [redacted] with an image depicting a deposit receipt for $11,300 into Mule-4's bank account.

10.14. On or about December 18, 2019, Mule-4's bank account originated a wire transfer of $8,770 to a bank account associated with [redacted]

10.15. On or about December 20, 2019, [redacted] bank account originated a wire transfer of $14,500 to a cryptocurrency exchange.

Victim A.H.

10.16. On or about January 5, 2020, INGRAM solicited Mule-5 for Mule-5's bank account information.

10.17. On or about January 9, 2020, an unknown male contacted A.H, an 83-year-old woman residing in La Quinta, California, by telephone, claiming to be her grandson. Her "grandson" stated that he had been arrested in Florida for drug possession, and needed A.H. to obtain a $16,000 cashier's check and deposit it to a bank account. That same day, A.H. deposited a $16,000 cashier's check to Mule-5's bank account.

10.18. On or about January 9, 2020, [redacted] messaged INGRAM information regarding a transfer to be sent from A.H. to Mule-5. Among other things, [redacted] provided INGRAM with A.H.'s name, location, wire transfer amount, purported reason for transfer: "Helping with funeral arrangements," and purported relation to Mule-5: "Very close friend."

10.19. On or about January 10, 2020, [redacted] directed INGRAM to send $1,600 each to Mule-4 for [redacted] and to [redacted] for [redacted]

10.20. On or about January 10, 2020, INGRAM instructed Mule-5 to send $1,600 each to Mule-4 and [redacted] using various peer-to-peer money transferring services.

10.21. On or about January 10, 2020, Mule-5 sent $1,600 to Mule-4 and $1,600 to [redacted]

Victim P.F.

10.22. On or about January 9, 2020, [redacted] messaged INGRAM that unidentified co-conspirators wanted to send a wire transfer to Mule-3's account the following day.

10.23. On or about January 10, 2020, an unknown female contacted P.F., an 81-year-old woman residing in North Babylon, New York, by phone claiming to be P.F.'s "granddaughter." The "granddaughter" stated that she had been arrested following a car accident, and directed P.F. to speak to her attorney, "Robert Cole."

10.24. On or about January 10, 2020, an unknown male claiming to be attorney "Robert Cole" told P.F. he needed $12,000 in cash for her granddaughter.

10.25. On or about January 10, 2020, an unknown male picked up $12,000 in cash from P.F.

10.26. On or about January 10, 2020, "Robert Cole" again contacted P.F. and told her that an additional $26,000 was needed for her "granddaughter" to get a court date. That same day, P.F. sent a $26,000 wire transfer to a bank account belonging to Mule-3.

10.27. On or about January 10, 2020, INGRAM provided Mule-3 with the wire sender's information, including P.F.'s name and address. INGRAM instructed Mule-3 to go to two banks and withdraw $8,500 from each.

Victims J.E. and H.A.

10.28. On or about January 16, 2020, an unknown female contacted J.E., a 76-year-old man residing in Burbank, California, by phone, claiming to be his daughter-in-law. She stated that she had been arrested following a traffic accident and needed $14,000 for bail.

10.29. On or about January 16, 2020, an unknown male contacted J.E. by phone, claiming to be "Robert Cole," the attorney for J.E.'s daughter-in-law. "Cole" stated that there was a gag order associated with the case prohibiting him from speaking with anyone about it, and that, unless J.E. paid $42,000 in cash that day, his daughter-in-law would need to stay in jail for approximately one month. "Cole" further stated that a bail bondsman named "James Taylor" would pick up the funds.

10.30. On or about January 16, 2020, an unknown male contacted H.A., a 77-year-old man residing in Pasadena, California, by phone, claiming that H.A.'s grandson had been arrested following a traffic collision. The unknown male, who identified himself as "Walter Baker," stated that he needed $23,700 for bail, that a gag order was in effect prohibiting H.A. from discussing the accident, and that an individual named "James Taylor" would pick up the money from H.A.'s residence.

10.31. On or about January 16, 2020, INGRAM and OWUOR drove together to pick up money from J.E. and H.A. Specifically:

i. On or about January 16, 2020, INGRAM collected $42,000 in cash from J.E. in Burbank, California.

ii. On or about January 16, 2020, INGRAM sent OWUOR a message containing the name of H.A., as well as the fictitious name "James Taylor."

iii. On or about January 16, 2020, OWUOR collected $23,700 in cash from H.A.

Victim P.T.

10.32. On or about February 2, 2020, an unknown male contacted P.T., a 73-year-old woman residing in San Francisco, California, claiming to be her grandson. Her "grandson" stated that he had been arrested.

10.33. On or about February 2, 2020, a second unknown male contacted P.T. claiming to be the attorney for her grandson. The "attorney" asked P.T. to deposit bail money to release her "grandson" from jail. On or about February 3, 2020, P.T. transferred $27,000 to a bank account provided to her by the "attorney."

10.34. On or about February 6, 2020, a third unknown male contacted P.T., claiming to be an attorney representing P.T.'s "grandson" in a civil settlement related to his arrest. At the instruction of the unknown male, P.T. transferred an additional $150,000 to a bank account provided to her by the unknown male.

10.35. On or about February 10, 2020, the third unknown male contacted P.T. to transfer an additional $40,000 to settle the "civil lawsuit." On or about February 11, 2020, at the instruction of the "attorney," P.T. sent a $40,000 wire transfer to a business bank account associated with [redacted]

10.36. Beginning on or about February 11, and continuing until on or about February 12, 2020, [redacted] and [redacted] exchanged a series of messages regarding an incoming wire transfer to [redacted] business account. Specifically:

i. [redacted] provided [redacted] with transfer instructions for the proceeds received from P.T., stating that 70% of the funds should be transferred to his "plug," [redacted] 10% should be transferred to [redacted] and 20% should be kept by [redacted]

ii. [redacted] messaged [redacted] a screen shot of the incoming transfer from P.T. to his bank account.

iii. [redacted] sent [redacted] sender information for the incoming wire transfer, including P.T.'s name and address.

10.37. On or about February 12, 2020, [redacted] received a $40,000 wire transfer from P.T.

10.38. On or about February 14, 2020, [redacted] sent a $29,000 wire transfer to [redacted] and a $2,600 wire transfer to [redacted]

10.39. On or about February 19, 2020, [redacted] sent a $13,060 wire transfer to a cryptocurrency exchange.

<u>Victim R.C.</u>

10.40. On or about March 2, 2020, an unknown female contacted R.C., a 76-year-old man residing in Grand Prairie, Texas, claiming to be R.C.'s granddaughter. R.C.'s "granddaughter" stated that she was in a car accident, had injured an undercover police officer, and had been arrested. She also stated that her lawyer would call R.C.

10.41. On or about March 2, 2020, an unknown female claiming to be the attorney for R.C.'s granddaughter contacted R.C. and his wife, 72-year-old L.C., by telephone. She stated that a gag order had been entered in the case, and if R.C. or L.C. told anyone about the case it would put the undercover police officer's life in jeopardy. She further stated that she needed $16,000 for bail. That same day, R.C. and L.C. sent a $16,000 wire transfer to a bank account belonging to Mule-6.

10.42. On or about March 2, 2020, [redacted] messaged the details of a $16,000 wire transfer, including R.C.'s name, address, and a trace number for the transaction, to an unknown individual.

10.43. On or about March 2, 2020, [redacted] messaged an unknown individual directing the purchase of a cashier's check made out to his "plug," [redacted] That same day, a cashier's check for $11,466 from Mule-6 was deposited to [redacted] bank account.

Victim L.B.

10.44. On or about March 16, 2020, an unknown female contacted L.B., an 86-year-old woman residing in Sagamore Hills, Ohio, stating that her granddaughter had been in an accident and needed money to post bond. That same day, L.B. provided $7,000 in cash to a male impersonating a bail bondsman.

10.45. On or about March 17, 2020, [redacted] made four ATM deposits in the amounts of $50, $2,680, $3,480, and $4,870 in Columbus, Ohio.

10.46. From on or about March 17, 2020, through on or about March 19, 2020, [redacted] and Mule-7 stayed at a hotel in Ohio.

10.47. On or about March 18, 2020, [redacted] sent a $9,600 wire transfer to [redacted]

10.48. On or about March 18, 2020, [redacted] sent a $23,200 wire transfer to a cryptocurrency exchange.

10.49. On or about March 19, 2020, [redacted] made three ATM deposits in the amounts of $4,050, $5,422, and $18,900 in Columbus, Ohio.

10.50. On or about March 19, 2020, an unknown male again contacted L.B. seeking additional funds.

10.51. On or about March 19, 2020, Mule-7 went to L.B.'s residence and attempted to pick up additional funds.

10.52. After Mule-7 was arrested during the pick-up attempt at L.B.'s residence on March 19, 2020, [redacted] and [redacted] exchanged a series of messages. Specifically:

i. On or about March 19, 2020, [redacted] messaged [redacted] "What do you do now? . . . Get rid of phones? . . . Leave! Now!!"

ii. On or about March 21, 2020, [redacted] sent to [redacted] a copy of the FBI criminal complaint affidavit charging Mule-7.

iii. On or about March 21, 2020, [redacted] messaged [redacted] to ask if he got rid of both SIM cards in his phone or only one. [redacted] also commented regarding the arrest, "I would never go to the same place twice. . . . you asking to get caught."

iv. On or about March 21, 2020, in response to [redacted] stating, "Ima send his people some bread," [redacted] wrote, "Well don't send them all. We need to pay bills too."

10.53. On or about March 20, 2020, [redacted] sent a $19,000 wire transfer to [redacted]

10.54. On or about March 20, 2020, [redacted] sent a $32,000 wire transfer to a cryptocurrency exchange.

Victims L.L., K.B., and J.H.

10.55. On or about March 25, 2020, [redacted] and [redacted] directed INGRAM, through a series of messages, to arrange for cash to be picked up from multiple victims located in the Los Angeles area.

10.56. On or about March 25, 2020, INGRAM exchanged a series of messages with OWUOR, in which INGRAM provided OWUOR with instructions for picking up money from victims L.L., K.B., and J.H. Among other things, INGRAM provided OWUOR with the addresses for L.L., K.B., and J.H.; provided OWUOR with "file numbers" to reference with each victim; instructed OWUOR to use the name "Alex Wafer" when picking up the cash from L.L. and K.B.; and used a ride-sharing application to arrange for a car to drive OWUOR to the victims' homes.

10.57. In March 2020, unknown males contacted L.L., K.B., and J.H. by telephone. Specifically:

i. On or about March 25, 2020, an unknown male contacted L.L., an 89-year-old woman residing in Downey, California, by telephone. The unknown male

claimed to be L.L.'s nephew, and stated that he had been arrested and needed money for bond.

ii. On or about March 25, 2020, OWUOR picked up approximately $8,000 in cash from L.L. using the name "Alex Wafer."

iii. On or about March 26, 2020, an unknown male claiming to be the attorney for L.L.'s nephew called L.L., asking for additional money for bail. At the instruction of the male, L.L. sent approximately $10,000 in cash via FedEx to an address in Middletown, Delaware.

iv. On or about March 25, 2020, an unknown male contacted K.B., a 77-year-old woman residing in Long Beach, California, by phone, claiming to be the nephew of K.B.'s daughter, J.B. The "nephew" stated that he had been arrested for driving under the influence and was in jail. He told K.B. not to tell his parents.

v. On or about March 25, 2020, an unknown individual spoke to K.B. on the phone, claiming to be the attorney for the "nephew," and stated that the "nephew" needed $8,000 for bail.

vi. On or about March 25, 2020, OWUOR picked up approximately $8,000 in cash from J.B. Before J.B. gave OWUOR the funds, OWUOR showed J.B. a code on his telephone, which matched a code J.B. had previously received from the individual claiming to be an attorney for the "nephew."

vii. On or about March 25, 2020, J.H., a 76-year-old woman residing in Arcadia, California, received a telephone call from a female claiming to be a close family friend. The female stated that she had been in an accident and needed money to get out of jail.

viii. On or about March 25, 2020, an unknown male who introduced himself as attorney "Jack Goodman" told J.H. that her friend needed $17,500 for bail money. "Goodman" explained that he would send a courier to pick up the money from J.H.

ix. On or about March 25, 2020, OWUOR picked up approximately $17,500 in cash from J.H.

10.58. On or about March 25, 2020, [redacted] instructed INGRAM to send funds to [redacted] Between March 25 and March 26, 2020, a total of $3,900 was transferred to [redacted] from a bank account belonging to GIFFORD.

Victim J.D.

10.59. On or about May 11, 2020, unknown individuals contacted J.D., an 87-year-old woman residing in Oceanside, California, within the Southern District of California, by telephone. Specifically:

i. On or about May 11, 2020, an unknown female called J.D., claiming to be J.D.'s granddaughter. The female stated that she had been arrested following a vehicle collision, needed $9,000 for bail, and asked J.D. to talk to her lawyer, "Matthew Halloway."

ii. On or about May 11, 2020, an unknown male claiming to be "Matthew Halloway" told J.D. that a judge entered a gag order in the case preventing J.D. from speaking with anyone about her granddaughter's situation. "Halloway" told J.D. that a courier from Brinks named "Ashley Sutton" would pick up the $9,000 in cash from J.D.

10.60. On or about May 11, 2020, INGRAM exchanged a series of messages with Mule-8 to arrange for money to be picked up from J.D. Among other things, INGRAM provided Mule-8 with J.D.'s address, the name of J.D.'s granddaughter, and a false name, "Ashley Sutton," to use when picking up cash from J.D.

10.61. On or about May 11, 2020, Mule-8 drove to J.D.'s residence and collected $9,000 in cash.

10.62. On or about May 12, 2020, an unknown male claiming to be accident specialist "Dennis Reynolds" called J.D. and stated that the other party in the vehicle collision had lost her baby as a result of the accident. "Reynolds" stated that he needed an additional $42,000, or else J.D.'s granddaughter would be charged with first degree manslaughter and spend 15-20 years in prison. "Reynolds" further advised J.D. to tell her bank and any family members who asked that the $42,000 was for a real estate investment.

At the instruction of the unknown male, J.D. sent a wire transfer in the amount of $42,000 to an account associated with THE ENTERPRISE.

10.63. On or about May 19, 2020, "Reynolds" called J.D. and advised her that she and her granddaughter had broken the gag order. As a result, J.D. needed to pay an additional $57,000, or her granddaughter would go to jail. At the instruction of the unknown male, J.D. sent a wire transfer in the amount of $57,000 to an account associated with THE ENTERPRISE.

<u>Victim J.A.</u>

10.64. On or about May 19, 2020, an unknown male contacted J.A., a 78-year-old woman residing in El Cajon, California, within the Southern District of California, by telephone, claiming to be her grandson. He stated that he needed $7,600 to pay for damages resulting from a DUI collision.

10.65. On or about May 19, 2020, INGRAM exchanged a series of messages with Mule-8 to arrange for cash to be picked up from J.A. Among other things, INGRAM provided Mule-8 with J.A.'s name, address, and grandson's name. INGRAM told Mule-8 that the money was to pay for damages to a car, and that Mule-8 was a "bailiff."

10.66. On or about May 19, 2020, Mule-8 picked up $7,600 in cash from J.A.

<u>Victim D.P.</u>

10.67. On or about May 20, 2020, an unknown male contacted D.P., a 79-year-old man residing in Carlsbad, California, within the Southern District of California, by telephone, claiming to be attorney "Jerry Rosen." "Rosen" told D.P. that his grandson was in legal trouble following a traffic collision. "Rosen" told D.P. that a clerk would go to D.P.'s residence to collect bail money for his grandson.

10.68. On or about May 20, 2020, an unknown male called D.P., claiming to be D.P.'s grandson. The male confirmed "Rosen's" story regarding a traffic collision, stated that he needed $20,000 to be bailed out of jail, and told D.P. not to tell anyone that he was in legal trouble.

10.69. On or about May 20, 2020, INGRAM exchanged a series of messages with Mule-8 to arrange for cash to be picked up from D.P. Among other things, INGRAM provided Mule-8 with D.P.'s name, address, and grandchild's name. INGRAM told Mule-8 that the money to be picked up, totaling $20,000, was for a bail payment.

10.70. On or about May 20, 2020, Mule-8 collected $20,000 in cash from D.P.

Victim B.M.

10.71. Beginning on or about May 28, 2020, and continuing through May 29, 2020, INGRAM and Mule-9 exchanged a series of messages relating to an incoming wire transfer of $30,000 from B.M., a 75-year-old woman residing in Rocky Face, Georgia.

10.72. On or about May 28, 2020, an unknown male contacted B.M. by telephone, claiming to be her grandson. Her "grandson" stated that he had been taken to jail for driving under the influence after a car accident, had broken his nose, and needed $30,000. He also asked B.M. not to tell his parents.

10.73. On or about May 28, 2020, an unknown male claiming to be the attorney for B.M.'s grandson spoke to B.M. by telephone and stated that he needed $30,000 for bail to get her grandson out of jail. That same day, B.M. made a wire transfer to a bank account belonging to Mule-9.

10.74. Beginning on or about May 28, 2020, and continuing through May 29, 2020, INGRAM exchanged messages with Mule-8 and Mule-9 regarding attempts to withdraw the wired funds from Mule-9's bank account.

Victim C.N.

10.75. On or about May 28, 2020, an unknown male contacted C.N., an 86-year-old man residing in Bonita, California, within the Southern District of California, claiming to be C.N.'s grandson. The male stated he had been in a bad car collision in Texas, and needed several thousands of dollars in cash to get out of jail. The male further told C.N. he did not want his parents to know about the accident.

10.76. On or about May 28, 2020, INGRAM and Mule-8 exchanged a series of messages to arrange for the pick-up of cash from C.N. Among other things, INGRAM

provided Mule-8 with C.N.'s name, the names of two possible grandchildren, and the amount of money to be picked up.

10.77. On or about May 28, 2020, Mule-8 drove to the vicinity of C.N.'s residence in Bonita, California.

10.78. On or about May 28, 2020, as Mule-8 was circling the block in the vicinity of C.N.'s residence and after it appeared that the attempt to extort and defraud C.N. had failed, INGRAM sent Mule-8 a message telling Mule-8 to leave, stating, "it jus burnt."

Victim G.P.

10.79. On or about May 31, 2020, an unknown male identifying himself as attorney "Jerry Roson" called G.P., an 86-year-old man residing in Spring Valley, California, within the Southern District of California, by telephone. "Roson" told G.P. that G.P.'s grandson had been involved in a traffic collision and was arrested on suspicion of driving under the influence, and needed cash for bail. "Roson" and G.P. subsequently exchanged multiple phone calls to arrange for the cash to be picked up.

10.80. On or about June 4, 2020, INGRAM messaged Mule-8 the address of G.P., then messaged Mule-8 the address of a different victim in Oak Park, California.

10.81. On or about June 4, 2020, INGRAM and OWUOR discussed OWUOR making the pickup from G.P.'s address with a female to make "it more smooth."

10.82. On or about June 4, 2020, OWUOR and Mule-10 traveled together to Spring Valley.

10.83. On or about June 4, 2020, Mule-10 picked up $18,000 in cash from G.P.

Victim B.S.

10.84. On or about June 9, 2020, GIFFORD messaged INGRAM a screenshot of an online bank account belonging to Mule-11.

10.85. On or about June 12, 2020, an unknown male contacted B.S., an 87-year-old woman residing in Fawn River, Michigan, pretending to be her grandson. He stated that he was in jail after getting pulled over for speeding, and needed $10,000 for bail.

10.86. On or about June 12, 2020, Mule-11 received an incoming wire transfer to her bank account from B.S. for $10,000.

10.87. On or about June 12, 2020, Mule-11 withdrew $10,000 from her bank account.

10.88. On or about June 13, 2020, an unknown male again contacted B.S., claiming to be "William Beck," an attorney for her "grandson." "Beck" stated that a handgun used in a murder had been found under her grandson's seat during the traffic stop. As a result, "Beck" claimed to need an additional $30,000 from B.S. to get her grandson out of jail.

10.89. On or about June 15, 2020, Mule-11 received a second wire transfer to her bank account from B.S. for $30,000.

10.90. On or about June 15, 2020, Mule-11 made two cash withdrawals from her bank account in the amounts of $8,500 each.

10.91. On or about June 16, 2020, Mule-11 withdrew $12,000 in cash from her bank account.

Victim J.S.

10.92. On or about June 17, 2020, an unknown male contacted J.S., an 84-year-old woman residing in San Diego, California, within the Southern District of California, by telephone, claiming to be her grandson. Her "grandson" stated that he had been in an accident and needed $20,000 for bail. After J.S. and her 84-year-old husband, R.S., stated that they could not afford $20,000, their "grandson" said $16,000 would be enough, and offered to pay it back.

10.93. On or about June 17, 2020, at approximately 10:39 a.m., INGRAM sent Mule-8 messages attempting to arrange for Mule-8 to pick up cash from J.S. and R.S.

10.94. On or about June 17, 2020, at approximately 11:43 a.m., Mule-8 messaged INGRAM that she was "not mobile."

10.95. On or about June 17, 2020, at approximately 11:44 a.m., INGRAM called GIFFORD.

10.96. On or about June 17, 2020, GIFFORD picked up $16,000 in cash from J.S.

10.97. On or about June 18, 2020, an unknown individual contacted J.S. stating that the driver of the other vehicle involved in the collision was injured and needed additional money as settlement for injuries. At the instruction of the unknown individual, on or about June 18, 2020, J.S. and R.S. wired $5,500 to a bank located in Mexico City.

Victim A.C.

10.98. On or about February 14, 2020, [redacted] messaged to [redacted] information for a bank account associated with [redacted]

10.99. On or about June 26, 2020, an unknown male contacted A.C., an 80-year-old man residing in Tupper Lake, New York, by phone claiming to be an attorney for A.C.'s grandson named "William Beck." "Beck" explained that A.C.'s grandson had been arrested and needed money for bail. On or about June 29, 2020, at the instruction of "Beck," A.C. sent a $50,000 wire transfer to the [redacted] bank account.

10.100. On or about June 29, 2020, [redacted] received a $50,000 wire transfer from A.C.

10.101. On or about June 30, 2020, [redacted] sent a $4,110 wire transfer to [redacted]

Victim P.M.

10.102. On or about August 31, 2020, Mule-12 rented lodging at an address in Irving, Texas, through at least September 2, 2020.

10.103. On or about September 1, 2020, an unknown male contacted P.M., an 80-year-old man residing in Jacksonville, Alabama, by phone claiming to be his nephew. The "nephew" stated that he had been jailed after an accident, needed bail money, and would have his attorney call P.M.

10.104. On or about September 1, 2020, a second unknown male contacted P.M., claiming to be "Steve Young," the attorney representing P.M.'s "nephew." At the

instruction of "Steve Young," P.M. overnighted $10,000 in cash via FedEx to Mule-12's rental address in Irving, Texas.

10.105. On or about September 2, 2020, [redacted] messaged Mule-12 regarding an incoming FedEx package sent to "Steve Young" at the Irving rental, including the FedEx tracking number, the name and address of sender P.M., and the amount: "10k."

10.106. On or about September 2, 2020, Mule-12 received a package containing $10,000 from P.M.

All in violation of Title 18, United States Code, Section 1962(d).

**Forfeiture Allegations**

11. The allegations contained in Paragraphs 1 through 10 are re-alleged and their reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America under Title 18, United States Code, Section 1963.

12. Upon conviction of the racketeering conspiracy offense charged in Count 1 of this Indictment, defendants shall forfeit to the United States any and all right, title, and interest they have in any property, real and personal, which the defendants have acquired or maintained in violation of Title 18, United States Code, Section 1962, or which constitutes, or is derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962.

13. If any of the above-described forfeitable property, as a result of any act or omission of the defendants —

A. cannot be located upon the exercise of due diligence;

B. has been transferred or sold to, or deposited with, a third party;

C. has been placed beyond the jurisdiction of the Court;

D. has been substantially diminished in value; or

E. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m), to seek forfeiture of any other substitute property of the defendants up to the value of the forfeitable property described above.

All pursuant to Title 18, United States Code, Section 1963.

DATED: July 28, 2021.

[redacted]

GUSTAV W. EYLER
Director, Consumer Protection Branch

By: ______________________
LAUREN M. ELFNER
WEI XIANG
Trial Attorneys

RANDY S. GROSSMAN
Acting United States Attorney

By: ______________________
OLEKSANDRA JOHNSON
Assistant U.S. Attorney

I hereby attest and certify on Jul 28, 2021 that the foregoing document is a full, true and correct copy of the original on file in my office and in my legal custody.

Clerk, U.S. District Court
Southern District of California

By: s/ E. Blase
Deputy